# EXHIBIT A

ASSET PURCHASE AGREEMENT

BY AND AMONG

RUGBY FOOTBALL CLUB LA LLC

AND

RUGBY ATL LLC,

DATED DECEMBER 20, 2023

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................1
    Section 1.1.    Definitions...........................................................................1
    Section 1.2.    Interpretation and Construction .......................................5

ARTICLE II PURCHASE AND SALE .......................................................................6
    Section 2.1.    The Closing.........................................................................6
    Section 2.2.    Actions to be Taken at the Closing ..................................6
    Section 2.3.    No Purchase or Transfer of Excluded Assets ..................6
    Section 2.4.    No Assumption of Excluded Liabilities.............................7
    Section 2.5.    Efforts Regarding Assumed Contracts.............................7
    Section 2.6.    Withholding ........................................................................7
    Section 2.7.    Treatment of Certain Payments .......................................7

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................7
    Section 3.1.    Organization of Seller .......................................................8
    Section 3.2.    Authority of Seller .............................................................8
    Section 3.3.    No Conflict..........................................................................8
    Section 3.4.    No Litigation.......................................................................8
    Section 3.5.    Intellectual Property..........................................................8
    Section 3.6.    Title to and Sufficiency of Assets .....................................9
    Section 3.7.    Compliance with Applicable Law; No Violation, Litigation or
                Regulatory Action..............................................................9
    Section 3.8.    Assumed Contracts ............................................................9
    Section 3.9.    ERISA...............................................................................10
    Section 3.10.   Employee Relations and Agreements ............................10
    Section 3.11.   No Brokers ........................................................................11
    Section 3.12.   Computer and Technology Security .................................11
    Section 3.13.   Solvency.............................................................................11

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER................11
    Section 4.1.    Organization of Buyer ......................................................11
    Section 4.2.    Authority of Buyer ............................................................11
    Section 4.3.    No Conflict........................................................................12
    Section 4.4.    Consents and Approvals ...................................................12
    Section 4.5.    No Litigation.....................................................................12

ARTICLE V ADDITIONAL AGREEMENTS ..........................................................12
    Section 5.1.    Tax Matters ......................................................................12
    Section 5.2.    Seller's Post-Closing Existence .......................................13
    Section 5.3.    Confidentiality ..................................................................13
    Section 5.4.    Nondisparagement ...........................................................14

ARTICLE VI INDEMNIFICATION ..........................................................................14
    Section 6.1.    Survival.............................................................................14
    Section 6.2.    Indemnification by Seller.................................................14
    Section 6.3.    Indemnification by Buyer ................................................15

(i)

Section 6.4.    Notice of Claims ...................................................................................15
Section 6.5.    Determination of Amount; Satisfaction .....................................................16
Section 6.6.    Third Party Claims ...................................................................................16
Section 6.7.    Materiality ...............................................................................................17
Section 6.8.    Tax Treatment .........................................................................................17
ARTICLE VII GENERAL PROVISIONS ....................................................................18
Section 7.1.    Notices .....................................................................................................18
Section 7.2.    Successors and Assigns; No Third Party Beneficiaries .........................19
Section 7.3.    Entire Agreement; Amendments .............................................................19
Section 7.4.    Waivers ....................................................................................................19
Section 7.5.    Expenses ..................................................................................................19
Section 7.6.    Partial Invalidity......................................................................................19
Section 7.7.    Execution in Counterparts .......................................................................19
Section 7.8.    Further Assurances...................................................................................20
Section 7.9.    Governing Law; Submission to Jurisdiction ...........................................20
Section 7.10.   Attorneys' Fees .......................................................................................20
Section 7.11.   Waiver of Jury Trial ................................................................................20
Section 7.12.   Specific Performance ..............................................................................21

<u>List of Schedules</u>:

| | |
|---|---|
| Schedule 1.1(a) | Acquired IP |
| Schedule 1.1(b) | Acquired Personal Property |
| Schedule 1.1(c) | Assumed Contracts |
| Schedule 3.4 | Potential Litigation |
| Schedule 3.10(a)(i) | Employees |
| Schedule 3.10(a)(ii) | Independent Contractors |
| Schedule 3.10(c) | Employee Arrangements |

<u>ASSET PURCHASE AGREEMENT</u>

This ASSET PURCHASE AGREEMENT is entered into as of December 20, 2023 (the "<u>Closing Date</u>"), by and among Rugby ATL LLC, a Delaware limited liability company ("<u>Seller</u>"), Rugby Football Club LA LLC, a Delaware limited liability company ("<u>Buyer</u>"), and, solely for the purposes of <u>clause (B)</u> of <u>Section 2.2(b)(iii)</u> and <u>Section 2.7</u>, Ulysses Diversified Holdings, LLC, a Delaware limited liability company ("<u>UDH</u>").

<u>RECITALS</u>

WHEREAS, Seller is the owner of the Purchased Assets and desires to sell the Purchased Assets and assign the Assumed Liabilities to Buyer, and Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, all on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, concurrently with the execution and delivery of this Agreement, (i) Buyer and Seller have entered into that certain General Conveyance, Bill of Sale and Assignment, dated as of the date hereof (the "<u>Bill of Sale</u>"), (ii) Buyer, Seller, the Seller Investors, and Oak Rugby Holdings, LLC have entered into that certain Amended and Restated Limited Liability Company of Buyer (the "<u>A&R LLCA</u>"), and (iii) Seller, Buyer, and Major League Rugby, LLC have entered into that certain Substitute Member Agreement, dated as of the date hereof (the "<u>Substitute Member Agreement</u>").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    <u>Definitions</u>.  In this Agreement, the following terms have the meanings specified or referred to in this <u>Section 1.1</u> and shall be equally applicable to both the singular and plural forms.

"<u>Acquired IP</u>" means all Intellectual Property owned by Seller, including those items identified and described on <u>Schedule 1.1(a)</u>.

"<u>Acquired Personal Property</u>" means all Systems, tangible assets and other personal property owned by Seller, including those items identified and described on <u>Schedule 1.1(b)</u>.

"<u>Acquired Proprietary Materials</u>" means all of Seller's policies, procedures, customer lists, software, website content, business plans, processes, training materials, books and records, and other business documents or records.

"<u>Action</u>" means any claim, action, suit, arbitration, proceeding, or investigation by or against any Person before any Governmental Authority, before an arbitrator or mediator, or asserted directly against Seller or any of its Affiliates.

"Affiliate" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly Controls, is Controlled by or is under Common Control with such Person.

"Agreement" means this Asset Purchase Agreement, including the Schedules.

"Ancillary Agreements" means all agreements, instruments and documents being or to be executed and delivered by Buyer or Seller under or in connection with this Agreement, including the Bill of Sale, the A&R LLCA, and the Substitute Member Agreement.

"Applicable Law" means (a) any order, law, statute, regulation, rule, ordinance, writ, injunction, directive, judgment, decree, principle of common law, constitution or treaty enacted, promulgated, issued, enforced or entered by, or any stipulation or requirement of, or binding agreement with, any Governmental Authority, as in effect at the applicable time, (b) all applicable judicial and administrative judgments, orders, stipulations, awards and writs and (c) any applicable regulatory consent orders or court approved settlements with Governmental Authorities.

"Assumed Contracts" means those certain Contracts that are specifically listed on Schedule 1.1(c).

"Assumed Liabilities" means the Liabilities that are incurred as a result of the ownership of the Purchased Assets from and after the Effective Time, excluding any Liabilities that arise out of any events, facts, or circumstances that occurred prior to the Effective Time.

"Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA); each incentive, profit-sharing, bonus, commission, stock option, stock purchase or other equity-based plan, policy or agreement; each retirement plan, each healthcare or other welfare plan; each disability, vacation or other leave plan, policy or agreement; each change in control, retention, severance or transaction bonus plan or arrangement; each deferred compensation plan, policy or agreement and any other benefit plans, programs and agreements, in each case established or maintained by Seller or any of its Affiliates for the benefit of any Employees, managers, former employees, former managers or contractors of Seller (or the beneficiaries or dependents of such individuals) or to which Seller or any of its Subsidiaries contributes or is obligated to contribute , or with respect to which Seller or any of its Subsidiaries may have any liability.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in Los Angeles, California, are authorized or obligated by law or executive order to close.

"Closing" means the closing of the transactions contemplated by this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Contracts" means any contract, agreement, understanding, arrangement, warranty, deed, power of attorney, purchase order, work order, commitment, assignment, certificate, covenant, assurance, undertaking, option, lease, license, insurance policy, sale and purchase order,

commitment and other instruments of any kind, whether written or oral, to which a Person is a party, is otherwise bound or has any current or future obligation or Liability.

"Control" means, as to any Person, the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by Contract. The terms "Controlled by" and "under Common Control with" shall have correlative meanings.

"Effective Time" means 12:01 a.m. Pacific Standard Time on the Closing Date.

"Employees" means the employees of Seller as of immediately prior to the Effective Time.

"Encumbrance" means any lien, adverse claim, charge, judgment, imposition, levy, attachment, license, security interest, security agreement, financing statement, mortgage, deed of trust, encroachment, pledge, easement, covenant, restriction, right of first refusal, right-of-way, conditional sale or other title retention agreement, option, preemptive right, defect in title or other adverse claims or encumbrance of a similar nature.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Excluded Assets" means all of Contracts of Seller that are not Assumed Contracts.

"Excluded Liabilities" means all liabilities and obligations of Seller (other than the Assumed Liabilities), whether such liabilities or obligations relate to payment, performance or otherwise, arise before, after or at the Effective Time, are known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not such liabilities and obligations are required to be accrued on any financial statements of Seller. For the avoidance of doubt, and without limiting the generality of the foregoing, Excluded Liabilities shall include, without limitation, all liabilities and obligations relating to the Excluded Assets, any Taxes of Seller, and any Taxes with respect to the Purchased Assets attributable to any Pre-Closing Tax Period.

"Fundamental Representations" means, collectively, the representations and warranties in Section 3.1 (Organization of Seller), Section 3.2 (Authority of Seller), Section 3.3 (No Conflicts), Sections 3.6(a), (b) and (c) (Title to and Sufficiency of Assets), Section 3.11 (No Brokers), Section 4.1 (Organization of Buyer), and Section 4.2 (Authority of Buyer).

"GAAP" means United States generally accepted accounting principles, consistently applied and as in effect on the date hereof consistently applied.

"Governmental Authority" means any United States federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body, board, department, instrumentality or commission,

"<u>Intellectual Property</u>" means: (a) patents, patent applications, and patent rights, (b) copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated with any of the foregoing, and (d) Trade Secrets.

"<u>Leased Real Property</u>" means the real property leased, occupied or used by Seller, pursuant to the Leases, together with all Facilities thereon and all easements, rights of way and other appurtenances thereto.

"<u>Leases</u>" means any and all leases, subleases, concessions, licenses and other similar agreements (whether written or oral) in connection with the occupancy or use of real or personal property by Seller, including all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto.

"<u>Liabilities</u>" means any Indebtedness, liability, claim, demand, expense, commitment or obligation (whether known or unknown, asserted or unasserted, direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, and including all costs and expenses related thereto.

"<u>Losses</u>" means actual losses, damages, costs and Liabilities of any kind.

"<u>Parties</u>" means the parties to this Agreement.

"<u>Person</u>" means any natural person, corporation, general or limited partnership, company, limited liability company, joint venture, limited liability partnership, firm, trust, estate, Governmental Authority or other legal entity.

"<u>Pre-Closing Tax Period</u>" means any taxable year or period (or portion thereof) ending on or before the day immediately preceding the Closing Date.

"<u>Purchased Assets</u>" means, collectively, (a) the Assumed Contracts, (b) the Acquired Proprietary Materials, (c) the Acquired IP, and (d) the Acquired Personal Property.

"<u>Seller's knowledge</u>" means the actual knowledge of each of Errik Anderson and each officer of Seller.

"<u>Software</u>" means any and all (a) computer programs, including any and all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (c) all documentation including user manuals and other training documentation relating to any of the foregoing.

"Systems" means the Software, computer, telecommunications capabilities (including all voice, data and video networks) and other similar or related technology assets or services used by Seller in the conduct of its business.

"Tax" (and, with correlative meaning, "Taxes") means (a) any and all federal, state, local or foreign income, gross receipts, margin, property, premium, sales, goods, use, estimated, license, lease, excise, capital, escheat, abandonment, unclaimed property taxes (or similar), franchise, profits, employment, unemployment, occupation, workers compensation, disability, severance, environmental, windfall, payroll, withholding, insurance, social security (or similar), alternative or add-on minimum, ad valorem, value added, net worth, stamp, transfer , registration, documentary, recapture, estimated, or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, whether disputed or not, together with any interest or penalty, addition to tax, or additional amount imposed by any Governmental Authority, (b) any liability for the payment of any amounts of the type described in the foregoing clause (a) as a result of being a member of an affiliated, consolidated, combined or unitary group for any taxable period or as the result of being a transferee or successor thereof and (c) any liability for the payment of any amounts of the type described in foregoing clause (a) or (b) as a result of any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, declaration, form, report, claim for refund, or similar statement provided or required to be provided with respect to any Tax (including any attached schedules), including any information return, declaration of estimated Tax, any return of an affiliated, combined or uniting group, and including any amendment thereof.

"Third Party" means a Person that is not (a) a Party to this Agreement or (b) an Affiliate of a Party to this Agreement.

"Trade Secrets" means trade secrets, know-how and other confidential business information.

Section 1.2.    Interpretation and Construction.  As used in this Agreement, except as otherwise indicated in this Agreement or as the context may otherwise require: (a) the words "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; (b) the word "or" is not exclusive; (c) references to an "Article," "Section," "preamble," "recital," or any other subdivision, or to a "Schedule," are to an article, section, preamble, recital, or subdivision of this Agreement, or to a schedule to this Agreement; (d) the words "this Agreement," "hereby," "hereof," "herein," "hereunder," and comparable words refer to all of this Agreement, including the Schedules to this Agreement, and not to any particular Article, Section, preamble, recital, or other subdivision of this Agreement or Schedule to this Agreement; (e) any pronoun in masculine, feminine, or neuter form shall include any other gender; (f) any word in the singular form includes the plural and vice versa; (g) references to any Applicable Law are to it as amended, modified, supplemented, and restated now or from time to time after the date of this Agreement, and to any corresponding provisions of successor Applicable Laws, and, unless the context requires otherwise, any reference to any statute shall be deemed also to refer to all rules and regulations promulgated thereunder; (h) references to any Person include such Person's respective successors and permitted assigns (and in the case of a natural person, such Person's heirs, estate, and personal

5

representatives); and (i) references to a "day" or number of "days" (without the explicit qualification of "Business") refer to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice may be taken or given on the next succeeding Business Day. Any financial or accounting term that is not otherwise defined in this Agreement shall have the meaning given such term under GAAP.

ARTICLE II
PURCHASE AND SALE

Section 2.1.    The Closing.  The consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place upon the execution and delivery of this agreement by all of the Parties.  The Closing shall be deemed to be effective at the Effective Time for all purposes, except as may otherwise be expressly provided herein.

Section 2.2.    Actions to be Taken at the Closing.  Subject to the terms and conditions of this Agreement, and in reliance upon the representations, warranties and covenants contained in this Agreement, on the Closing Date:

(a)    Purchase and Sale of the Assets.  Pursuant to the Bill of Sale, (i) Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of the Purchased Assets, free and clear of all Encumbrances, and (ii) Seller shall assign to Buyer, and Buyer shall assume from Seller, the Assumed Liabilities.

(b)    Payment of the Purchase Price.  The purchase price for the Purchased Assets shall be paid by Buyer as follows (such issuance and payments, collectively, the "Purchase Price"):

(i)    Concurrently with the Closing, Buyer shall issue and deliver to Seller, under and pursuant to the A&R LLCA, 5,3000,000 Class A Preferred Units (as defined in the A&R LLCA);

(ii)    Concurrently with the Closing, under and pursuant to the Substitute Member Agreement and subject to the terms and conditions thereof, Buyer shall assume liability for the Indebtedness (as defined therein) from Seller;

(iii)    Following the Closing, but in no event later than on March 1, 2024, Buyer shall, in one or more payments that shall be at such time or times selected by Buyer in its sole discretion, (A) pay to Seller, by wire transfer of immediately available funds to such bank account as Seller shall specify in writing to Buyer upon Buyer's request, $241,680 and (B) pay to UDH, at the direction and on behalf of Seller, to such bank account as UDH shall specify in writing to Buyer upon Buyer's request, $642,825.23.

Section 2.3.    No Purchase or Transfer of Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Excluded Assets (a) are not part of any purchase or transfer contemplated hereunder and (b) shall remain the sole property of Seller.

Section 2.4.    No Assumption of Excluded Liabilities.    Notwithstanding anything to the contrary contained in this Agreement, (a) Buyer shall not assume, and shall not otherwise be responsible for paying, performing or discharging, any Excluded Liabilities, and (b) all Excluded Liabilities shall remain the sole responsibility of, and be paid, performed and discharge by, Seller.

Section 2.5.    Efforts Regarding Assumed Contracts.    If any provision of any Assumed Contract included as part of the Purchased Assets would prohibit any attempted assignment thereof or of any right or interest thereunder (whether by operation of law, upon a change in control or otherwise) or impose a charge, discount or penalty upon an assignment (in each case, to the extent such provision is enforceable under Applicable Law) without the consent of the other party to such agreement, even though such assignment would not become effective until such consent was obtained, then except as hereinafter provided, nothing in this Agreement shall be deemed an assignment of any such Assumed Contract, right or interest, and the Assumed Contract, right or interest shall not be a "Purchased Asset" hereunder unless and until such consent is obtained.  After the Closing, the Parties shall, at Seller's expense (a) use commercially reasonable efforts to obtain as promptly as possible all consents and waivers necessary for the sale, transfer, assignment and delivery of any such Assumed Contracts, rights or interests to Buyer (to the extent such transfer is legally permissible), and (b) cooperate with each other following the Closing Date in any reasonable arrangement designed to provide Buyer with the rights and benefits (subject to the obligations) under any such Assumed Contract, including enforcement for the benefit of Buyer of any and all rights against any other party thereto and performance by Buyer of the obligations under all such Assumed Contracts that are not assigned at the Closing by reason of this Section 2.5.

Section 2.6.    Withholding.    Buyer shall be entitled to deduct and withhold from the consideration otherwise payable to Seller or any other recipient of payments pursuant to this Agreement all amounts required under the Code or any applicable provision of any state, local or foreign Tax law to be deducted and withheld with respect to the making of such payment under the Code, or any provision of state, local or foreign Tax law and to collect any necessary Tax forms, including IRS Forms W-8 or W-9, as applicable, or any similar information from Seller and any other recipients of payments hereunder.    To the extent that any such amount is properly deducted and withheld by Buyer, such amount shall be treated for all purposes of this Agreement as having been paid to the recipient with respect to which the payment would otherwise have been made.

Section 2.7.    Treatment of Certain Payments.    As between UDH and Seller, it is agreed that (a) any payment made by Buyer to UDH pursuant to clause (B) of Section 2.2(b)(iii) shall be treated as a payment by Seller to UDH for purposes of that certain letter agreement, dated August 9, 2023, by and between Seller and UDH (the "UDH Agreement"), and (b) UDH shall waive the equity allotment and interest amounts due from Seller to UDH under the UDH Agreement in respect of any amount so paid.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that, as of the date hereof:

Section 3.1.  <u>Organization of Seller</u>.  Seller is duly formed, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to conduct its business as it is being conducted, and to perform all of its obligations under this Agreement and the Ancillary Agreements to which it is a party.  Seller is duly qualified to do business and is in good standing under the laws of each jurisdiction that requires such qualification.

Section 3.2.  <u>Authority of Seller</u>.  Seller has the requisite power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party. The execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements to which it is a party have been duly authorized and approved by all necessary limited liability company action on the part of Seller, and no other limited liability company proceedings are necessary to authorize this Agreement and the other Ancillary Agreements to which it is a party or for Seller to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly authorized, executed and delivered by Seller, and (assuming the valid authorization, execution and delivery of this Agreement by Buyer) is the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, and each of the Ancillary Agreements to which it is a party has been duly authorized by Seller and upon execution and delivery by each of Seller (assuming the valid authorization, execution and delivery by each of the other parties thereto) will be a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights and to general equity principles (the "<u>Bankruptcy and Equity Exceptions</u>").

Section 3.3.  <u>No Conflict</u>.  Neither the execution and delivery by Seller of this Agreement or of any of the Ancillary Agreements to which it is a party or the consummation by Seller of any of the transactions contemplated hereby or thereby nor compliance by Seller with or fulfillment by Seller of the terms, conditions and provisions hereof or thereof will:

(a)    result in a violation or breach of the terms, conditions or provisions of, or constitute, an event of default upon either of Seller or any of the assets of Seller, including the Purchased Assets, under (i) any Governmental Permit, Assumed Contract, note, instrument, mortgage, lease, franchise, financial obligation or other Contract to which either Seller is a party or by which any asset of Seller is bound, (ii) any Applicable Law affecting Seller or the certificate of organization (as amended) and operating agreement (as amended) of Seller; or

(b)    require the approval, consent, authorization or act of, or the making by Seller of any declaration, filing or registration with, any Governmental Authority.

Section 3.4.  <u>No Litigation</u>.  Except as set forth on Schedule 3.4, there is no pending or, to Seller's knowledge, threatened Action against Seller or any of its Affiliates, directors, officers or employees.

Section 3.5.  <u>Intellectual Property</u>.

(a)    Except as set forth on Schedule 3.5, each item of the Acquired IP is owned by Seller free and clear of any and all Encumbrances.

(b)    The Acquired IP is all of the Intellectual Property used in the operation of the business of the Seller.

(c)    To Seller's knowledge, the operation of the business of Seller as currently conducted does not infringe upon or misappropriate the Intellectual Property of any Third Party.

(d)    To Seller's knowledge, no Third Party is engaging in any activity that infringes upon the Acquired IP.

(e)    Seller has taken commercially reasonable measures to protect the confidentiality of all Trade Secrets included in the Acquired IP.

Section 3.6.    <u>Title to and Sufficiency of Assets</u>.

(a)    Except as set forth on Schedule 3.6, Seller has good, valid and marketable title to the Purchased Assets free and clear of all Encumbrances other than Encumbrances to be released as of the Closing.

(b)    The Purchased Assets include all of the tangible and intangible assets, properties and rights, of any nature whatsoever necessary to conduct Seller's business as presently conducted or necessary to permit Buyer to conduct the business immediately after the Closing in the same manner as the business has been conducted by Seller prior to the Closing, other than the Contracts to which Seller is a party that are not Assumed Contracts.

(c)    The Acquired Personal Property is in good operating condition and repair, subject to ordinary wear and tear, and is substantially fit for use in accordance with the past practices of Seller in all material respects. The Acquired Personal Property is adequate for the purposes for which such assets are currently used or are held for use by Seller.

Section 3.7.    <u>Compliance with Applicable Law; No Violation, Litigation or Regulatory Action</u>.

(a)    Since December 21, 2021, (i) Seller has complied, and currently is in compliance, in all material respects with all Applicable Laws, and (ii) Seller has not received any written notice or, to Seller's knowledge, any oral notice from any Governmental Authority asserting that it is not in compliance in any material respect with any Applicable Law.

(b)    There is no Action of any kind pending or, to Seller's knowledge, threatened against Seller, other than routine regulatory audits of Seller by Governmental Authorities. There are no outstanding orders, writs, judgments, decrees, injunctions or settlements with or of any Governmental Authority to which Seller is subject or to which any of the Purchased Assets are bound.

Section 3.8.    <u>Assumed Contracts</u>. Each Assumed Contract is in full force and effect and constitutes a legal, valid and binding agreement, enforceable against Seller and each other party thereto, in accordance with its terms, subject to the Bankruptcy and Equity Exceptions. None of Seller nor, to Seller's knowledge, any other party to any Assumed Contract is in default under, nor has there occurred any event or condition that, with or without the passage of time or giving of

9

notice (or both), would constitute a default under, or permit the termination, modification or acceleration of, any such Assumed Contract.  Seller has provided Buyer with true and complete copies of each Assumed Contract.

Section 3.9.    ERISA.  No event or circumstance has occurred with respect to any Benefit Plan that could reasonably be expected to result in any liability of Buyer or any of its Affiliates.

Section 3.10.    Employee Relations and Agreements.

(a)    Schedule 3.10(a)(i) contains, for each Employee, a true, complete and correct list of the:  Employee's name; hire date; department; current annual salary or hourly rate of pay (whichever is applicable); total compensation paid by Seller in 2022 (whether earned in 2021 or 2022); total bonuses and commissions paid during the period commencing on January 1, 2023 and ending on October 31, 2023 (whether earned in 2022 or 2023); part-time, full-time or temporary status; exempt or non-exempt status; and leave of absence status (including FMLA and disability), including any expected return to work date.  Schedule 3.10(a)(i) also sets forth a list of each "covered employee" and any "qualified beneficiary" related to such covered employee who has experienced a "qualifying event" or is receiving "continuation coverage" as of the date hereof, and identifies the date and nature of each such qualifying event, in each case, as such term is defined in COBRA.   Other than as set forth on Schedule 3.10(a)(i), each Employee may be terminated at will by Seller without penalty or any continuing obligations, except for any accrued benefits under the Benefit Plans and statutory obligations to former employees.  Schedule 3.10(a)(ii) contains a true, complete and correct list of each current independent contractor and consultant of Seller and the compensation paid to each such independent contractor or consultant during 2022 and in 2023 through the Closing Date.  Since December 21, 2021, all individuals classified by Seller as independent contractors have satisfied the requirements of Applicable Law to be so classified, and Seller has fully and accurately reported each such independent contractor or consultant's compensation on IRS Forms 1099 during such period when required to do so.

(b)    Seller is not a party to any collective bargaining agreement or other labor union contract applicable to any Employee.  At all times since December 21, 2021 through the date hereof, there has been no unfair labor practice charge, complaint, or other legal proceeding pending or threatened against Seller, and Seller has not engaged in any unfair labor practices; and there have been no employment-related Actions pending or, to Seller's knowledge, threatened, against Seller before any Governmental Authority.  The classification of Employees and other service providers as employees or non-employee service providers complies, and has at all times since December 21, 2021 complied, with any Applicable Law, including but not limited to applicable requirements of the Fair Labor Standards Act.  At all times since December 21, 2021, Seller has made payment in full to all Employees of all wages, salaries, commissions, bonuses, benefits and other compensation currently due to such Employees.  Seller is in compliance with all Applicable Law related to employment.

(c)    Schedule 3.10(c) sets forth all written and employment contracts between Seller and any Employee and between Seller and any individual formerly employed by Seller under which Seller has ongoing obligations (the "Employment Arrangements"); provided, that, if any Employee is employed under a form offer letter or form employment agreement, such form may be listed and Seller shall indicate which Employees are employed under such form offer letter

10

or form employment agreement and the date such Employee signed such form offer letter of employment agreement.  Seller is in compliance in all material respects with all of the Employment Arrangements.  There are no Actions pending or, to Seller's knowledge, threatened, against Seller by any current or former employee that is a party to an Employment Arrangement arising out of such Employment Arrangement.  Seller has provided Buyer with true and complete copies of each written Employment Arrangement.

Section 3.11.  <u>No Brokers</u>.  Neither Seller nor any Person acting on behalf of Seller has paid or become obligated to pay any fee or commission to any broker, finder or intermediary, and no Person is or shall become entitled to any such fee or commission, for or on account of the transactions contemplated by this Agreement.

Section 3.12.  <u>Computer and Technology Security</u>.  Seller has taken all reasonable steps to safeguard its Systems, including the implementation of procedures to ensure that the Systems are free from any disabling code or instruction, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software routine or hardware component that permits unauthorized access to or disablement of the Systems, or the unauthorized capture or erasure of data.  To Seller's knowledge, since December 21, 2021 there has been no material successful unauthorized intrusion or breach of the security of the Systems.

Section 3.13.  <u>Solvency</u>.  Seller is able to pay its debts as they become due and owns property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities).  Immediately following the Closing, Seller will be solvent for all purposes under federal bankruptcy and applicable state fraudulent transfer and fraudulent conveyance Applicable Law and the transactions contemplated by this Agreement do not constitute fraudulent transfers and fraudulent conveyances under such Applicable Law.

ARTICLE IV
<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller that, as of the date hereof:

Section 4.1.  <u>Organization of Buyer</u>.  Buyer has been duly organized and is validly existing and in good standing under the laws of the State of Delaware.  Buyer has the requisite limited liability company power and authority to own or use its assets and to perform all of its obligations under this Agreement and the Ancillary Agreements to which it is a party.  Buyer is duly qualified to do business and is in good standing under the laws of each jurisdiction that requires such qualification.

Section 4.2.  <u>Authority of Buyer</u>.  Buyer has the requisite limited liability company power and authority to execute, deliver and perform this Agreement and each of the Ancillary Agreements to which it is a party.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by Buyer have been duly authorized and approved by Buyer's board

11

of managers or similar governing body and do not require any further authorization or consent of its members. This Agreement has been duly authorized, executed and delivered by Buyer and (assuming the valid authorization, execution and delivery of this Agreement by Seller) is the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, and each of the Ancillary Agreements to which Buyer is a party has been duly authorized by Buyer, and upon execution and delivery by Buyer will be (assuming the valid authorization, execution and delivery by each of the other parties thereto) a legal, valid and binding obligation of such Buyer, enforceable against Buyer in accordance with its terms, in each case, subject to the Bankruptcy and Equity Exceptions.

Section 4.3.    No Conflict.    Neither the execution and delivery of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby, by Buyer will (a) result in a violation or breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any note, instrument, mortgage, license, lease, agreement, contract, franchise, financial obligation or other Contract to which such Buyer is a party or by which Buyer is bound, (b) violate the certificate of formation or the limited liability company agreement of Buyer, (c) violate any Applicable Law.

Section 4.4.    Consents and Approvals.    No filing or registration with, no notice to and no permit, authorization, consent or approval of any Third Party or any Governmental Authority or other Person is necessary for the consummation by Buyer of the transactions contemplated by this Agreement other than pursuant to the requirements of federal and state securities laws.

Section 4.5.    No Litigation.    As of the date of this Agreement, there is no Action pending or threatened against Buyer that is reasonably expected to materially impair or delay the ability of Buyer to consummate the transactions contemplated by, or to perform its obligations under, this Agreement or any Ancillary Agreement to which it is a party.

ARTICLE V
ADDITIONAL AGREEMENTS

Section 5.1.    Tax Matters.

(a)    Transfer Taxes.    All transfer, registration, stamp, documentary, value added, recording, filing, sales, use and similar Taxes (including all applicable real estate transfer or gains Taxes and transfer Taxes), incurred in connection with or arising out of the transactions contemplated by this Agreement shall be shared equally by Buyer and Seller. The Party required by Applicable Law to do so shall file any and all Tax Returns and other documentation required to be filed in connection with such Taxes and, if required by Applicable Law, the non-filing party shall, and shall cause their Affiliates to, join in the execution of any such Tax Return and other documentation.

(b)    Allocation.    By no later than February 16, 2024, Buyer shall prepare in good faith, and deliver to Seller, an allocation of the Purchase Price (and all other capitalized costs) and the Assumed Liabilities among the Purchased Assets in accordance with Code Section 1060 and

12

the Treasury Regulations thereunder (the "Allocation Schedule").  Any adjustment to the Purchase Price shall be allocated in a manner consistent with the Allocation Schedule.  Seller shall timely and properly prepare, execute, file and deliver all such documents, forms, and other information as Buyer may reasonably request to prepare such Allocation Schedule.  Neither Buyer nor Seller shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by Applicable Law.  The provisions of this Section 5.1(c)(ii) will survive the Closing indefinitely.

        (c)     Cooperation on Tax Matters.

        (i)     Buyer and Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the preparation and filing of any Tax Return and any audit or other proceeding with respect to Taxes, including the timely signing of any such Tax Returns or documents relating to any audit or other proceeding upon the request of such other Party.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information which are reasonably relevant to any such audit or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Seller agrees (A) to retain all books and records with respect to Tax matters pertinent to Seller relating to any Pre-Closing Tax Period, and to abide by all record retention agreements entered into with any Tax Authority, (B) to give Buyer reasonable written notice prior to destroying or discarding any such books and records and, if Buyer so request, shall allow Buyer to take possession of such books and records, and (C) to provide to Buyer any powers of attorney or other similar documents reasonably necessary for Buyer to exercise its rights and duties under Section 5.1(b).

        (ii)     Seller agrees to make available to Buyer records in the custody of Seller or of any Affiliate of Seller, to furnish other information (including all adjustments to and changes in Tax items of Seller for Pre-Closing Tax Periods) and otherwise to cooperate to the extent reasonably required for (A) the preparation, filing or audit of or other proceeding with respect to Tax Returns required to be filed by Buyer or (B) compliance with ASC 740-10.

        Section 5.2.    Seller's Post-Closing Existence.  Seller shall remain a limited liability company, validly existing and in good standing under the laws of its jurisdiction of formation, and shall not dissolve or liquidate (or enter into or adopt a plan of dissolution or liquidation) or otherwise terminate its limited liability company existence until the expiration of the Fundamental Representation Survival Period.

        Section 5.3.    Confidentiality.  Seller acknowledges that the businesses and the business objectives of Buyer involve the acquisition of the Purchased Assets, including confidential and proprietary information relating to the Purchased Assets, as well as the goodwill of Seller, in consideration for good and valuable consideration provided by Buyer at the Closing as described in Article II, the sufficiency of which is hereby acknowledged.  Seller acknowledges and agrees that it would be unfair to divulge or utilize such information relating to such businesses and the Purchased Assets or goodwill in competition with Buyer after the Closing Date.  Therefore, for a period of five (5) years after the Closing Date, Seller shall not nor shall any of its Affiliates directly or indirectly, use or divulge any trade secrets, customer lists, pricing information, marketing arrangements or strategies, business plans, internal performance statistics, training manuals,

personnel information, Intellectual Property or any other information concerning the Purchased Assets, Buyer or any of its Affiliates ("Confidential Information"); provided, however, that the covenants contained in this Section 5.3 shall not apply to the following: (a) information that is or becomes generally available to the public other than as a result of a disclosure by Seller or its Affiliates in violation of the terms of this Section 5.3 or any other terms of this Agreement; (b) information that is or becomes available to Seller or its Affiliates from a Third Party who is not, to the respective knowledge of Seller or Seller Investors at the time of receipt, bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligations of confidentiality to, Buyer or any of its Affiliates or any other Person with respect to such information; or (c) information that Seller or its Affiliates are legally compelled to disclose by judicial or administrative process or by other Applicable Law; provided, however, that in the case of disclosure compelled by judicial or administrative process, Seller and its Affiliates shall, to the extent permitted by Applicable Law, notify Buyer promptly of the request or requirement so that Buyer and/or its Affiliates may seek an appropriate protective order or waive compliance with the provisions of this Section 5.3.

Section 5.4.    Nondisparagement.  During the five (5) year period immediately following the date hereof, neither Party (including in the case of Seller, Global Rugby Ventures LLC and Ulysses Diversified Holdings LLC, and in the case of Buyer, Oak Rugby Holdings LLC) shall make any negative comments or other communications about, or otherwise disparage the other Party or that Party's business; provided, however, that nothing herein shall preclude a Party from making truthful statements that are necessary to comply with any Applicable Law or Governmental Authority, or to defend or enforce such Person's rights under this Agreement, any Ancillary Agreement or any other Contract between or among the Parties.

ARTICLE VI
INDEMNIFICATION

Section 6.1.    Survival.  Other than the Fundamental Representations, the representations and warranties contained herein, along with all rights and remedies with respect to breaches or inaccuracies thereof, shall survive the Closing Date and shall expire at the end of the day (Pacific Standard Time) on the date that is the first (1st) anniversary of the Closing Date.  The Fundamental Representations, along with all rights and remedies with respect to any breaches or inaccuracies thereof, shall survive the Closing Date and expire on the third (3rd) anniversary of the Closing Date (the "Fundamental Representation Survival Period").    An Indemnified Party's claim for indemnification under this Article VI shall be made on or prior to the date on which the survival period for such representation and warranty expires, it being understood that claims made in writing in accordance with the notice provisions hereof on or prior to such expiration date and describing the claim in reasonable detail shall survive such expiration date and claims first made after such expiration date shall be barred.  The right of any Person to indemnification, payment, reimbursement or other remedy based upon breaches of such representations and warranties shall not be affected by any investigation conducted with respect to, or any knowledge of any Person acquired at any time, whether before or after the execution and delivery of this Agreement, with respect to the accuracy or inaccuracy of or compliance with any such representation or warranty.

Section 6.2.    Indemnification by Seller.

14

(a)     From and after the Closing, subject to the limitations set forth in this Article VI, Seller agrees to indemnify and hold Buyer and its Affiliates, and its directors, managers, officers, employees, agents and representatives (the "Buyer Indemnified Parties") harmless from and against any and all Losses paid, suffered or incurred by any Buyer Indemnified Party as a result of or arising from:

(i)     any breach of any warranty or the inaccuracy of any representation of Seller contained in this Agreement;

(ii)     any breach by Seller of, or failure by Seller to perform, any of its covenants or obligations contained in this Agreement or any Ancillary Agreement, other than covenants or obligations that, by their terms, were to be performed prior to the Closing;

(iii)     any of the Excluded Liabilities or Excluded Assets;

(iv)     the operation of the business of Seller or its Affiliates, prior to the Closing Date; or

(v)     any claims against Buyer or its Affiliates under any successor liability or similar theory to the extent such claims arise out of the actions or inactions of Seller or its employees or agents or representatives, whether prior to or after the Closing Date.

Section 6.3.     Indemnification by Buyer.

(a)     From and after the Closing, Buyer agrees to indemnify and hold Seller and its Affiliates, and its and their directors, managers, officers, employees, agents and representatives (the "Seller Indemnified Parties") harmless from and against any and all Losses incurred by any Seller Indemnified Party as a result of or arising from:

(i)     any breach of any warranty or the inaccuracy of any representation of Buyer contained in this Agreement;

(ii)     any breach by Buyer of, or failure by Buyer to perform, any of its covenants and obligations contained in this Agreement or any Ancillary Agreement, other than covenants or obligations that, by their terms, were to be performed prior to the Closing;

(iii)     the ownership or operation of the Purchased Assets after the Closing Date; or

(iv)     any Assumed Liabilities or Purchased Assets.

Section 6.4.     Notice of Claims.  In the event that a Buyer Indemnified Party or a Seller Indemnified Party, as applicable, are seeking indemnification hereunder (the "Indemnified Party") against Seller or Buyer, as applicable (the "Indemnitor"), in connection with a claim that does not involve a Third Party Claim, the Indemnified Party shall promptly deliver to the Indemnitor a notice of such claim setting forth in reasonable detail the facts giving rise to such claim (to the extent known by the Indemnified Party) and the amount or estimated amount (to the extent reasonably estimable) of Losses arising out of, involving or otherwise in respect of such claim and

15

shall include a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based. The failure to give notice as provided in this Section 6.4 shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been materially prejudiced as a result of such failure.

Section 6.5.    Determination of Amount; Satisfaction. The amount of any Losses payable in accordance with this Article VI shall be calculated net of any third-party insurance, indemnification or other proceeds that have actually been recovered by the Indemnified Party under any insurance policy or other Contract or undertaking in connection with the facts giving rise to the right of indemnification (net of any applicable collection costs and reserves, deductibles, premium adjustments and retrospectively rated premiums), it being understood that an Indemnified Party shall not be obligated to obtain or maintain any type of insurance coverage or initiate any Action in order to obtain recovery under insurance policies with respect to any particular indemnifiable matter. Any amounts payable pursuant to this Article VI shall be paid without duplication, and in no event shall any Person be indemnified under different provisions of this Agreement or any Ancillary Agreement for the same Loss. Any amounts payable by Seller to a Buyer Indemnified Party pursuant to this Agreement (upon mutual agreement of Buyer and Seller or final judicial determination) may be offset against any other amounts due to Seller by Buyer or any of its Affiliates under this Agreement or any of the Ancillary Agreements.

Section 6.6.    Third Party Claims.

(a)    Any Party seeking indemnification provided for under this Agreement in respect of, arising out of or involving a claim or demand made by any third Person against the Indemnified Party (a "Third Party Claim") shall promptly notify the Indemnitor in writing of such Third Party Claim (setting forth in reasonable detail the facts giving rise to such Third Party Claim (to the extent known by the Indemnified Party) and the amount or estimated amount (to the extent reasonably estimable) of Losses arising out of, involving or otherwise in respect of such Third Party Claim and shall include a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such Third Party Claim is based. Thereafter, the Indemnified Party shall promptly deliver to the Indemnitor copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim. The failure to give notice as provided in this Section 6.6 shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been materially prejudiced as a result of such failure.

(b)    In the event of the initiation of any Action against the Indemnified Party in connection with a Third Party Claim, the Indemnitor may, within ten (10) days after receipt of such notice and upon notice to the Indemnified Party, assume, with counsel reasonably satisfactory to the Indemnified Party, at the sole cost and expense of the Indemnitor, the settlement or defense thereof (in which case any Losses associated therewith shall be the sole responsibility of the Indemnitor; provided, that the Indemnified Party may participate in such settlement or defense through counsel chosen by it at its sole expense, and provided, further, that the Indemnitor shall not be entitled to assume or continue control of the defense of any Third Party Claim if (i) the Third Party Claim relates to or arises in connection with any criminal Action or any Action by a Governmental Authority, (ii) the Third Party Claim seeks an injunction or equitable relief against

16

any Indemnified Party, (iii) the Indemnitor or any of its Affiliates is also a named party to such Third Party Claim and counsel for each side agree that if the Indemnified Party and the Indemnitor were to be represented by the same counsel, it would result in a conflict of interest for such counsel or prejudice the prosecution of the defenses available to the Indemnified Party, or (iv) the Indemnitor has failed or is failing to defend in good faith the Third Party Claim.

(c)     In the case of any assumption of a defense, negotiation or settlement of any Action, claim or demand pursuant to Section 6.6(b), each of the Parties agrees to reasonably cooperate with the other Party in connection with such defense, negotiation or settlement and to make available to the other Party all witnesses, pertinent records, materials and information in such Party's possession or under such Party's control relating thereto as is reasonably required by the other Party; provided, however, that prior to providing such records, materials and information, such other Party shall enter into a customary confidentiality agreement with respect thereto.  To the extent the Indemnitor elects not to defend such Action, claim or demand, and the Indemnified Party defends against or otherwise deals with any such Action, claim or demand, the Indemnified Party may retain counsel and control the defense of such Action, claim or demand. Notwithstanding the foregoing, irrespective of whether the Indemnitor assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, settle, compromise or discharge, such Third Party Claim without the Indemnitor's written consent (not to be unreasonably withheld, conditioned or delayed).  If the Indemnitor assumes the defense of any Third Party Claim, then (i) the Indemnified Party may participate, at its own expense, in the defense of such Third Party Claim and (ii) the Indemnitor may not settle any such Action, claim or demand which settlement obligates the Indemnified Party to pay money, to perform obligations or to admit liability without the written consent of the Indemnified Party (not to be unreasonably withheld, conditioned or delayed).  After any final judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the time in which to appeal therefrom has expired, or a settlement shall have been consummated, or the Indemnified Party and the Indemnitor shall arrive at a mutually binding agreement with respect to each separate matter alleged to be indemnified by the Indemnitor hereunder, the Indemnified Party shall forward to the Indemnitor notice of any sums due and owing by it with respect to such matter, and the Indemnitor shall pay all of the sums so owing to the Indemnified Party by wire transfer, certified or bank cashier's check within five (5) Business Days after the date of such notice.

(d)     To the extent of any inconsistency between this Section 6.6 and Section 5.1 (relating to Tax matters), the provisions of Section 5.1 shall control with respect to Tax matters.

Section 6.7.    Materiality.  Notwithstanding anything to the contrary contained herein, for the purposes of determining whether there has been any inaccuracy in or breach of a representation or warranty and for purposes of calculating Losses under this ARTICLE VI, all qualifications or exceptions in any representation or warranty relating to or referring to the terms "material", "materiality", "in all material respects", "in any material respects" or any similar term or phrase shall be disregarded; provided, however, that this Section 6.7 shall not apply for purposes of determining the existence of fraud.

Section 6.8.    Tax Treatment.  All indemnification payments made under this Agreement (including, but not limited to, the indemnification described in Section 5.1 shall be treated by Seller

17

and Buyer as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Applicable Law.

ARTICLE VII
<u>GENERAL PROVISIONS</u>

Section 7.1.    <u>Notices</u>.    All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered when sent by e-mail (and immediately after transmission, receipt of which has been confirmed by telephone by the sender) or when delivered by registered or certified mail (postage prepaid, return receipt requested) or by an internationally recognized overnight courier service addressed as follows:

If to Buyer, to:

> Rugby Football Club LA LLC
> 6345 Balboa Blvd. Ste 375
> Encino, CA 91316
> Attn: Peter Sickle
> Email: petesickle@gmail.com

with a copy (which shall not constitute notice) to:

> Sheppard Mullin Richter & Hampton LLP
> 333 S. Hope Street, 43rd Floor
> Los Angeles, CA 90071
> Attn:  David Sands
> Email: dsands@sheppardmullin.com

If to Seller, to:

> Global Rugby Ventures LLC
> 44 S Main Street, Second Floor
> Hanover, NH 03755

with a copy (which shall not constitute notice) to:

> Gardner Preston PLLC
> P.O. Box 86
> Hanover, NH 03755
> Attn: Ryan Gardner
> Email: ryan@gardnerpreston.com

or to such other address as such Party may indicate by a notice delivered to the other Party in accordance herewith.

Section 7.2.   <u>Successors and Assigns; No Third Party Beneficiaries</u>.   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   No Party may assign its rights or delegate its obligations under this Agreement without the express prior written consent of the other Party, except that Buyer, at its option and without the consent of Seller, may assign all of its rights and obligations hereunder to (a) a direct or indirect wholly-owned subsidiary of Buyer, or (b) one or more lenders for collateral security purposes, in each case, upon notice to Seller; <u>provided</u> that no such assignment described by the foregoing clauses (a) and (b) shall be made by Buyer unless and until Buyer has entered into a written guaranty with and for the benefit of Seller in a form acceptable to Seller pursuant to which Buyer fully and unconditionally guarantees the performance by the assignee of Buyer's obligations under this Agreement.   It is expressly agreed that nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person other than the Parties and their respective successors and assigns permitted hereby, any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 7.3.   <u>Entire Agreement; Amendments</u>.   This Agreement and the documents delivered pursuant hereto (including the Ancillary Agreements) contain the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersede all other prior representations, warranties, agreements, understandings or letters of intent between or among any of the Parties.   Except as otherwise set forth herein, this Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

Section 7.4.   <u>Waivers</u>.   Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized representative of such Party.   The failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.   No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 7.5.   <u>Expenses</u>.   Except as expressly set forth herein, each Party will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein.

Section 7.6.   <u>Partial Invalidity</u>.   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under Applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 7.7.   <u>Execution in Counterparts</u>.   This Agreement may be executed and delivered (including by facsimile transmission or sent by email in portable document format (PDF) in

counterparts), each of which shall be considered an original instrument, but all of which shall be deemed to constitute one and the same agreement.

Section 7.8.    <u>Further Assurances</u>.  Subject to, and not in limitation of, the provisions set forth elsewhere in this Agreement (including in <u>Section 5.2</u> and <u>Section 6.5</u>), each of the Parties agrees to use its commercially reasonable efforts to take or cause to be taken all action, to do or cause to be done, and to assist and cooperate with the other Party in doing, all things reasonably necessary, proper or advisable under Applicable Law to consummate and make effective the transactions contemplated by this Agreement, including: (a) the satisfaction of the conditions precedent to the obligations of any of the Parties; and (b) the execution and delivery of such instruments, and the taking of such other actions, as the other Party may reasonably require in order to carry out the intent of this Agreement.  From and after the Closing, Seller and Buyer will execute and deliver, and will cause their respective Affiliates to execute and deliver, such further instruments of conveyance and transfer and take such other actions as might reasonably be requested by any Party to carry out the purposes and intent of this Agreement and any other Ancillary Agreement, including the acquisition of necessary authorizations or consents that were not required to be obtained by the Closing (or as to which delivery at the Closing was waived).

Section 7.9.    <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of Delaware.  By the execution and delivery of this Agreement, Seller and Buyer submit to the exclusive personal jurisdiction of any state or federal court in the State of Delaware, including in the Delaware Court of Chancery in New Castle County, in any Action arising out of or relating to this Agreement and the Ancillary Agreements.  In any such Action, each Party hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any such Action brought in such court and any claim that any such Action brought in such court has been brought in an inconvenient forum.  Each Party also agrees that any final, non-appealable judgment against a Party in connection with any Action may be enforced in any court of competent jurisdiction, either within or outside the United States.  A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment.  Each Party agrees that any process or other paper to be served in connection with any Action under this Agreement shall, if delivered, sent or mailed in accordance with <u>Section 7.1</u>, constitute good, proper and sufficient service thereof.

Section 7.10.   <u>Attorneys' Fees</u>.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, then the prevailing Party shall be entitled to reasonable attorneys' fees, costs, and disbursements in addition to any other relief to which such Party may be entitled.

Section 7.11.   <u>Waiver of Jury Trial</u>.  The Parties hereby expressly waive any right to trial by jury in any dispute, whether sounding in contract, tort or otherwise, between or among any of the Parties arising out of or related to the transactions contemplated by this Agreement or any of the Ancillary Agreements, or any other instrument or document executed or delivered in connection herewith or therewith.  Any Party may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their right to trial by jury.

Section 7.12.  <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the terms or provisions of this Agreement related to the transactions contemplated hereby were not performed in accordance with their specific wording or were otherwise breached.  It is accordingly agreed that, notwithstanding anything to the contrary contained in this Agreement, each of the Parties shall be entitled to an injunction or injunctions and other equitable relief to prevent such breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States of America or any state having jurisdiction, such remedy being in addition to any other remedy to which any Party may be entitled at law or in equity.  Each of the Parties hereby waives (a) the defense that a remedy at law would be adequate and (b) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

**BUYER:**

RUGBY FOOTBALL CLUB LA LLC

By: _Peter Sickle_ _____
Name: Peter Sickle
Its:    Sole Member

**SELLER:**

RUGBY ATL LLC

By: _____
Name: Global Rugby Ventures LLC, Manager
Its:    Errik Anderson, Manager

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

**BUYER:**

RUGBY FOOTBALL CLUB LA, LLC

By: _____
Name:
Its:

**SELLER:**

RUGBY ATL LLC

By: _____
Name: Global Rugby Ventures LLC, Manager
By:    Errik Anderson, Manager

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

**UDH:**

ULYSSES DIVERSIFIED HOLDINGS, LLC, solely for the purposes of <u>clause (B)</u> of <u>Section 2.2(b)(iii)</u> and <u>Section 2.7</u>

By: _Errik Anderson_

Name: Errik Anderson
Its: Authorized Individual

[*Signature Page to Asset Purchase Agreement*]

## LIST OF SCHEDULES AND DISCLOSURE SCHEDULES

This List of Schedules and Disclosure Schedules (the "**Schedules**") is made and given in connection with that certain Asset Purchase Agreement, dated as of December 20, 2023 (the "**Agreement**"), by and between Rugby ATL LLC ("**Seller**") and Rugby Football Club LA LLC ("**Buyer**"). All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the Schedule referenced in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure. Nothing in these Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. The inclusion of any item in these Schedules (1) does not represent a determination that such item is material or establish a standard of materiality, and (2) shall not constitute, or be deemed to be, an admission to any third party concerning such item. These Schedules include brief descriptions or summaries of certain agreements and instruments, copies of which have been provided to Buyer.

**<u>Schedule 1.1(a)</u>**

**Acquired IP**

1.      Right to and attendant license rights to a Major League Rugby franchise

2.      Unlicensed common law intellectual property rights in Rugby ATL (no trademark or other filings)

**Schedule 1.1(b)**

**Acquired Personal Property**

See Exhibit 1.1(b).

Exhibit 1(b)

| Player Apartment Inventory | |
|---|---:|
| Beds | 22 |
| Coffee Makers | 4 |
| Couches | 6 |
| Cuttlery sets | 9 |
| Dining chairs | 22 |
| Dining tables | 6 |
| Dishware Sets | 9 |
| Dressers | 12 |
| Mattresses | 22 |
| Microwaves | 5 |
| Pot/Pan Sets | 9 |
| Sheet sets | 15 |
| TV Stands | 4 |
| TVs | 3 |
| Vacuums | 6 |
| | |
| **ITEM** | **QUANTITY** |
| Queen Beds | 14 |
| King Beds | 2 |
| Headboards | 7 |
| Box springs | 9 |
| Side Tables (individual) | 10 |
| Side Tables (sets of two) | 4 |
| Desks | 3 |
| Coffee tables | 6 |
| TV stands | 5 |
| Dining tables | 5 |
| TV tables | 4 |
| Lamps | 10 |
| Bedroom Sets | 1 |
| Nightstands | 5 |
| 9 cube storage shelf | 1 |
| Platsic storage drawers | 1 |
| Counter height charis | 4 (1 set) |
| Faux leather dining chairs | 4 (1 set) |
| Desk chairs | 2 |
| Outside chairs | 2 (1 set) |
| Dining chairs | 4 (2 sets |
| Ottomans | 2 |
| Microwaves | 7 |
| Crockpots | 1 |
| Air Fryers | 1 |
| Coffee Machines | 3 |
| Toasters | 1 |

| Game Day Operations | Quantity | Location |
|---|---|---|
| Card Readers | 8 | Tech Room |
| Extension Cords | 4 | Biz Ops office |
| HIA Replay Equipment | 2 | Tech Room |
| Inflatable blower (new) | 1 | Storage Room |
| Lenovo (AXS owned) | 4 | Office |
| Monitor | 1 | Tech Room |
| Newer Lights | 2 | Tech Room |
| Power Strips | 5 | Office |
| Printer | 1 | Conf. Room |
| Projector | 1 | Tech Room |
| SAT 2 Controller | 1 | Tech Room |
| Scanner | 1 | Conf. Room |
| Shopify Station w/ipad mount | 2 | Office |
| Ticket Printers | 4 | Tech Room |
| Ticket Scanner Charger | 2 | Tech Room |
| Ticket Scanners | 8 | Tech Room |
| Commercial Electronics | Quantity | Location |
| 55 Inch TV | 1 | Office |
| Breville Espresso Machine | 1 | Office |
| HP Printer | 1 | Office |
| Ipad | 1 | Office |
| Macbooks | 5 | Office |
| Microwave | 1 | Kitchen |
| Mini-Fridge | 1 | Kitchen |
| NVR System | 1 | Tech Room |
| Shredder | 1 | Conf. Room |
| Speakers | 2 | Tech Room |
| Production Inventory | Quantity | Location |
| American flags on poles | 2 | Event Storage Room |
| Camera tripod | 1 | Tech Room |
| Headsets and Mic for Podcast | 2ea | Raj Room |
| Military flags on poles | 3 | Event Storage Room |
| VIP Suite Lights | 16 | Raj Room |

| Merchandise Hardware/Equipment | Quantity | Location |
|---|---|---|
| 5-hook grid waterfalls for hangers (black) | 33 | Merch Room |
| 5-hook grid waterfalls for hangers (silver) | 4 | Merch Room |
| Acrylic tabletop signs | 6 | Merch Room |
| Electronic Scale | 1 | Merch Room |
| Female torso | 2 | Merch Room |
| Grid basket (black) | 5 | Merch Room |
| Grid basket (silver) | 4 | Merch Room |
| Grid merchandise displays (black) | 2 | Merch Room |
| Grid shelf (black) | 5 | Merch Room |
| Label Maker | 1 | Merch Room |
| Male torso | 2 | Merch Room |
| Metal signage frames (attaches to rolling racks) | 3 | Merch Room |
| Metal signage frames (tabletop) | 5 | Merch Room |
| Plastic literature holders | 2 | Merch Room |
| Price Tags | 1 Box | Merch Room |
| Pricing Gun | 1 | Merch Room |
| Rolling Racks (silver) | 2 | Biz Ops Office |
| Tagging Barbs | 1 Box | Merch Room |
| Tagging Gun | 1 | Merch Room |
| Tall, metal hat rack (black) | 1 | Biz Ops Office |
| Torso frame stand (black) | 2 | Biz Ops Office |

| Performance Inventory/Furniture/Electronics | Quantity | Location |
|---|---|---|
| 24in TV | 1 | S&C room |
| 42in TVs | 3 | Mounted |
| 55in TV | 1 | Mounted |
| 65in TVs | 2 | Mounted |
| 75in TVs | 1 | Mounted |
| Access Points | 4 | Various/ |
| Blenders | 5 | Kitchen |
| Cash Box | 2 | Mgrs/Coaches Office |
| Chest Freezer | 1 | Kitchen |
| Coach Radios+ Headsets | 8 | Coaches Room |
| Computer Monitors | 6 | Offices + Coaches room |
| Cots | 2 | Lounge |
| Couch | 1 | Lounge |
| Decorative Chairs | 5 | Offices |
| Decorative Office Tables | 5 | Various |
| DJI Mini Drone | 1 | S&C room |
| Drone | 1 | Office + Coaches Room |
| Ethernet Cameras | 5 | Various |
| HP Printer | 1 | Coaches Room |
| Ipad for GPS | 1 | S&C room |
| iPads | 2 | S&C Room |
| Just Jump Force Plate | 1 | S&C room |
| Leather Recliners | 6 | Lounge |
| Lenovo laptop | 1 | Mgr |
| Macbooks | 5 | Various/Out |
| Meal Tables | 10 | Lounge |
| Metal Storage Shelves | 11 | Various |
| Mini Projector | 1 | Coaches & S&C Rooms |
| Mini-Split AC Units | 4 | Lounge |
| Normatec Recliners | 2 | Lounge |
| Normatec Recovery Systems | 2 | Lounge |
| Office Chairs | 12 | Offices |
| Ping Pong Table | 1 | Lounge |
| Player Data GPS Bras | 60 | S&C room |
| Player Data GPS Units | 100 | S&C room |
| Presentation Tables | 2 | Coaches Room+Lounge |
| Radios with headsets | 8 | S&C room |
| Rectangle Office Tables | 9 | Offices |
| Rolling TV Stands | 3 | Various |
| Round Office Tables | 2 | Offices |
| Rugby ATL Folding Chairs | 58 | Various |
| Shredder | 1 | Mgrs Office |
| Smart Controller | 1 | |
| Sony Camcorder | 1 | S&C room |

| | | |
|---|---|---|
| StatSports Docking Station | 1 | S&C room |
| StatSports GPS Units | 38 | S&C room |
| StatSports Live GPS Tracking Antenna | 2 | S&C room |
| Water Dispensers | 2 | Lounge and Commercia |
| White Boards | 5 | Various |
| Witty Timing Systen (4 lasers, 1 controller) | 1 | S&C room |
| | | |
| Performance Equipment | Quantity | Location |
| Air Compressor | 1 | Equipment Room |
| Bar cushions | 6 | Gym |
| Battle Ropes | 2 | Gym |
| DC Blocks | 16 | Gym |
| Farmers Carry Bar | 4 | Gym |
| Field post pads (green) | 2 | Conex Box |
| Gilbert Body Wedges | 6 | Container |
| Grip and rip | 2 | Container |
| Gym Fans - Large | 2 | Gym |
| Hex Bar Large | 2 | Gym |
| Hex Bar Small | 1 | Gym |
| High Ball Backpack Pad | 1 | Container |
| Kettle Bell Set | 1 | Gym |
| Mini saussages | 6 | Container |
| Offset Bench Bar | 1 | Gym |
| Peanuts | 5 | Equipment Room |
| Platform Boxes - Cushioned Set | 1 | Gym |
| Platform Boxes - Metal Set | 1 | Gym |
| Rhino Tackle Rings | 2 | Equipment Room |
| Rhino Tackle Tubes | 8 | Container |
| Rogue Bars | 6 | Gym |
| Rogue Glute/Hammy Stations | 2 | Gym |
| Rogue Resistance Bands | 12 | Gym |
| Rogue Speed Bikes | 4 | Cardio |
| Rougue Dip Bar attachements | 4 | Gym |
| Rowers | 2 | Cardio |
| Ruck King | 1 | Container |
| Sideline flag stakes (metal) | 28 | Conex Box |
| Sideline Flag Stakes (red) | 14 | Conex Box |
| Sideline Flag tops (red or black) | 18 | Conex Box |
| Sideline Flag tops (white) | 14 | Conex Box |
| Sideline Flags Stakes (green) | 14 | Conex Box |
| Speed Ladders | 2 | Equipment Room |
| Speed Sleds | 4 | Gym |
| Squat Safety Bar | 1 | Gym |
| Velocity Based Equipment | | |
| Yoke Bar | 1 | Gym |
| Maintenance Equipment | Quantity | Location |
| Vacuums / Shop Vacs | 4 | Maintenance Closet |
| Performance Kit | Quantity | Location |
| Travel Bag | 5 | Kit Room |

| Business Operations Inventory | Quantity | Location (From door view walking in) |
|---|---|---|
| 10'x10' Tents | 5 | Conex Box |
| 10'x15' Tents | 3 | Conex Box |
| 10'x20' Tent | 1 | Conex Box |
| 4-Person tug-o-war game | 1 | Conex Box |
| 4' Tables | 2 | Conex Box |
| 6' black table cloths | 8 | Event Storage Room |
| 6' Foldable Tables | 11 | Conex Box |
| 6' Non-foldable Tables | 2 | Conex Box |
| 60" Round Tables | 5 | Storage Room |
| 8' Tables | 2 | Conex Box |
| Airborn Inflatable Bag w/ blower | 1 | Storage Room |
| Black Bins | 2 | Event Storage Room |
| Black Table cloths | 4 | Right wall next to door |
| Black Travel Bin with cords/cables | 1 | Tech Room |
| Blue tarps | 2 | Conex Box |
| BodyArmor (large, sideline) towels | 48 | Event Storage Room |
| Burgundy folding chairs | 19 | Biz Ops office |
| CO2 Canister | 1 | Storage Room |
| Commercial-grade string lights (48') | 2 | Event Storage Room |
| Conference table (small) | 1 | Biz Ops office |
| Conference tables (large) | 2 | Biz Ops office |
| Custom wooden DJ booth/bar | 1 | Conex Box |
| Folding signage stand (black) | 1 | Event Storage Room |
| Generator | 1 | Storage Room |
| Highboy tablecloths (black) | 3 | Event Storage Room |
| Highboy Tables | 2 | Event Storage Room |
| Lanyards | 421 | Merch Room |
| Powerstrips | 4 | Biz Ops office |
| Red Tents (small) | 5 | Under Performance office stairs |
| Rhino Goal Post Pad (green) | 4 | Conex Box |
| Room fans | 2 | Event Storage Room |
| Sandwich board signs (white) | 8 | Conex Box |
| Sideline A-frames signs | 69 | Conex Box |
| Standing Decks | 9 | Biz Ops office |
| Tent carrying bags | 3 | Conex Box |
| Water dispensers | 2 | Biz Ops office |

## **Schedule 1.1(c)**

**Assumed Contracts**

None.

**Schedule 3.4**

**Potential Litigation**

On December 21, 2021, the Purchased Assets were purchased by GRV from MLR Atlanta LLC ("**MLR Atlanta**") pursuant to an Agreement for the Purchase and Sale of Assets (the "**MLR Agreement**"). GRV subsequently assigned the Purchased Assets to Seller in January of 2022 (the "**Assignment**"). On August 18, 2023, counsel for MLR Atlanta sent a letter to counsel for GRV requesting documents relating to the Assignment and any potential sale or transfer of the Purchased Assets. Counsel for GRV responded on August 28, 2023, with counsel for MLR Atlanta responding to that letter on September 1, 2023. Since that date, GRV has received no further communications from MLR Atlanta. MLR Atlanta has not asserted that there is an existing default under the MLR Agreement.

**<u>Schedule 3.5</u>**

**Intellectual Property**

See Schedule 3.4.

**Schedule 3.6**

**Title to and Sufficiency of Assets**

See Schedule 3.4.

**<u>Schedule 3.10(a)(i)</u>**

**Employees**

See Exhibit 3.10(a)(i).

Exhibit 10(a)(i)

| Last Name | First Name | Hire Date | Termination Date | Department | Title | Current Annual Salary | Total compensation paid in 2022 | Total compensation paid in 2023 | Eligible for Bonus or Commissions? | Bonus or commision paid in 2023 | Achieved target for bonus or commission in 2023 | Part-time, Full-time or temporary | Exempt or Non-exempt | Leave of absence status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aumer | Brooke | 5/1/2023 | 11/10/2023 | Business Operations | Events & Partnerships Manager | $ 38,000.00 | n/a | $ 14,469.25 | No | n/a | n/a | Full-time | Exempt | |
| Baistrocchi | Lucas | 12/1/2021 | n/a | Performance | Strength & Conditioning and Skills Coach | $ 60,000.00 | $ 46,538.46 | $ 43,846.30 | Yes | $ - | No | Full-time | Exempt | n/a |
| Bradford | Blake | 10/1/2019 | n/a | Performance | Assistant Head Coach & Academy Business Le | $ 77,000.00 | $ 71,076.72 | $ 56,269.21 | Yes | $ - | No | Full-time | Exempt | n/a |
| Brett | Steve | 12/1/2021 | n/a | Performance | Head Coach | $130,000.00 | $ 130,634.69 | $ 107,524.33 | Yes | $ - | No | Full-time | Exempt | n/a |
| Carney | Mark | 10/11/2021 | n/a | Performance & Rugby ATL Founda | Director, Rugby Operations & Foundation CEO | $ 80,000.00 | $ 60,000.00 | $ 58,403.95 | Yes | $ - | No | Full-time | Exempt | n/a |
| Le | Josh | 12/15/2022 | n/a | Business Operations | Vice President, External Relations | $120,000.00 | $ 3,461.54 | $ 80,230.78 | Yes | $ - | No | Full-time | Exempt | n/a |
| Leach | Shannon | 11/17/2022 | n/a | Business Operations | Operations Manager | $ 45,000.00 | $ 4,631.57 | $ 32,235.28 | No | n/a | n/a | Full-time | Exempt | n/a |
| Oorloff | Declan | 2/1/2023 | n/a | Performance | Performance Analyst | $ 50,000.00 | $ 39,910.00 | $ 50,000.08 | Yes | $ - | No | Full-time | Exempt | n/a |
| Rice | Ansley | 4/27/2023 | 11/3/2023 | Business Operations | Social Media & Marketing Coordinator | $ 32,000.00 | $ - | $ 13,046.16 | No | n/a | n/a | Full-time | Exempt | n/a |
| Windsor White | Amanda | 1/2/2022 | n/a | Business Operations | President, Business Operations | $165,000.00 | $ 115,384.56 | $ 117,038.56 | Yes | $ - | No | Full-time | Exempt | n/a |

**Schedule 3.10(a)(ii)**

**Independent Contractors**

See Exhibit 3.10(a)(ii).

<u>Exhibit 10(a)(ii)</u>

| Last Name | First Name | Role | Department | 2022 Gross Pay (minus Q1) | 2023 Gross Pay to Date |
|-----------|-----------|------|-----------|---------------------------|------------------------|
| Sagoo | Rajpal | Chief Information Officer | Business Operations | $    24,000.00 | $    24,750.00 |

**Schedule 3.10(c)**

**Employee Arrangements**

     1.     That certain Employment Letter for Amanda Windsor White, dated March 22, 2023, by and between Rugby ATL, LLC, and Amanda Windsor White.

     2.     That certain Confidential Offer Letter for Francis Bradford, dated March 1, 2022, by and between Rugby ATL, LLC and Francis Bradford.

     3.     That certain Confidential Offer Letter for Mark Carney, dated January 1, 2023, by and between Rugby ATL, LLC and Mark Carney.

     4.     That certain Confidential Offer Letter for Stephen Brett, dated March 23, 2022, by and between Rugby ATL, LLC and Stephen Brett.

# EXHIBIT B

*Execution Version*

## MAJOR LEAGUE RUGBY, LLC

### WRITTEN CONSENT IN LIEU OF A MEETING

### REGARDING SALE OF INTEREST IN MLR ATLANTA, LLC

December 16, 2021

THIS WRITTEN CONSENT IN LIEU OF A MEETING has been executed effective December 16, 2021 (the "***Effective Date***"), pursuant to the provisions of Section 5.6 and Section 9.1 of the Second Amended and Restated Operating Agreement of Major League Rugby, LLC ("***MLR***") dated October 22, 2021 (the "***Operating Agreement***") and the Conflict of Interest Policy of MLR dated effective June 1, 2019 (the "***Policy***"). Unless otherwise defined herein, capitalized terms used in this written consent shall have the same meaning as set forth in the Operating Agreement.

**WHEREAS**, MLR Atlanta LLC d/b/a Rugby ATL ("***Atlanta***") is a Member of MLR;

**WHEREAS**, 100% of the membership interest owners of Atlanta desire to sell their right, title and interest in and to such membership interests to Global Rugby Ventures, LLC ("***GRV***") (such sale, the "***Sale Transaction***");

**WHEREAS**, the equity interests in GRV are currently held by the following individuals in the following proportions: (i) Errik Anderson (89.7%); (ii) Paul Hourigan (8%); and (iii) Alex Kipel (2.3%);

**WHEREAS**, GRV currently has debt holders holding convertible notes, none of which have been converted into equity in GRV and none of such debt holders possess any affiliation, financial or otherwise, to the sport of rugby, whether domestic or international;

**WHEREAS**, GRV does not currently have any institutional investors;

**WHEREAS**, Errik Anderson, an MLR Board member, (i) through his ownership interests in Ulysses Diversified Holdings LLC and its affiliates, currently owns a majority interest in one (1) Member of MLR, namely Thunder Co LLC d/b/a New England Free Jacks ("***New England***"); and (ii) through his ownership interests in GRV, currently owns a minority interest in three (3) Members of MLR, namely Washington D.C. Professional Rugby, LLC d/b/a Old Glory DC ("***Washington***"), NOLA Rugby Enterprises LLC d/b/a NOLA Gold ("***New Orleans***"), and Seattle Rugby, LLC d/b/a Seattle Seawolves ("***Seattle***" and together with New England, Washington and New Orleans, the "***Existing Teams***");

**WHEREAS**, by virtue of Errik Anderson's ownership interests in the Existing Teams, and pursuant to Article II, Section 2(b) of the Policy, Mr. Anderson has a "financial interest" in the Sale Transaction and, as such, is an "interested person" under Article II, Section 1 of the Policy;

**WHEREAS,** by virtue of Errik Anderson's ownership interests in GRV, and pursuant to Article II, Section 2(d) of the Policy, Mr. Anderson has a "financial interest" in the Sale Transaction and, as such, is an "interested person" under Article II, Section 1 of the Policy;

**WHEREAS**, pursuant to the Policy, and with respect to the Sale Transaction, the Board has determined that a more advantageous transaction not producing a conflict of interest is not reasonably possible under circumstances;

**WHEREAS**, pursuant to the Policy, the Board has considered all material facts concerning the Sale Transaction and, upon such consideration, a majority of the disinterested Board members have determined that the Sale Transaction (i) is in the best interests of MLR; (ii) is fair and reasonable; and (iii) is permitted;

**WHEREAS**, pursuant to Section 9.1 of the Operating Agreement, except with respect to Permitted Transfers, a Transfer of any direct or indirect ownership interest in any Member requires approval by a Majority Vote (excluding the Member whose Interest is being Transferred);

**WHEREAS**, the Sale Transaction does not meet the requirements of a Permitted Transfer; and

**WHEREAS**, a Majority in Interest (excluding Atlanta (pursuant to the Operating Agreement) and New England (pursuant to the Policy)) is willing to approve and authorize the Sale Transaction;

**NOW THEREFORE LET IT BE:**

**RESOLVED**, that, pursuant to the Policy, Errik Anderson, by affixing his signature to this written consent, acknowledges his status as an "interested person" and the existence of a "financial interest" in the Sale Transaction;

**RESOLVED,** that the Sale Transaction be, and hereby is, approved by a Majority in Interest.

**RESOLVED**, that this written consent may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same written consent.  The counterparts of this written consent may be executed and delivered by electronic signature.

*[Signature page follows]*

**IN WITNESS WHEREOF**, Errik Anderson has duly executed this written consent effective as of the Effective Date, solely for the purposes set forth Article III, Section 1 of the Policy and not for the purpose of approving the Sale Transaction.

By: *Errik Anderson*
_____
5CE4D3D4ED79436...

Name: Errik Anderson

[*Signature Page of Errik Anderson to Written Consent*]

GRV-RFCLA –000000111

**IN WITNESS WHEREOF**, the undersigned Members have duly executed this written consent effective as of the Effective Date for the purpose of approving the Sale Transaction.


AMERICAN RUGBY INVESTMENTS, LLC

By: *Ryan Patterson*

A2D105449A1C4B1...

Name: Ryan Patterson

Title: Manager


AMEROCK RUGBY, LLC

By: *Neil Leibman*

3B1628DAE3264B1...

Name: Neil Leibman

Title: Manager


ELITE RUGBY MANAGEMENT, LLC

By: 

D025881AE39040B...

Name: Adam Gilchrist

Title: Manager


LOYALS, LLC

By: 

D025881AE39040B...

Name: Adam Gilchrist

Title: Manager


NOLA RUGBY ENTERPRISES LLC

By: 

C614EAA49DCF43E...

Name: Tim Falcon

Title: Manager


*[Signature Page of Members to Written Consent]*

RUGBY UNITED NEW YORK, LLC

By: _____
Name: Guy Bolton
Title: Manager


RUGBY UTAH VENTURES, LLC

By: _____
Name: Kimball Kjar
Title: Manager


SABERCATS, LLC

By: _____
Name: Mike Loya
Title: Manager


SEATTLE RUGBY, LLC

By: _____
Name: Adrian Balfour
Title: Manager


WASHINGTON D.C. PROFESSIONAL RUGBY, LLC

By: _____
Name: Christopher S. Dunlavey
Title: Chairman


ARROWS HOLDINGS LIMITED PARTNERSHIP

By: TORONTO ARROWS GP INC., its general partner

By: _____
Name: William R. Webb
Title: Chief Executive Officer


[*Signature Page of Members to Written Consent*]